1

2

3

4

5

6

7

8

9                    UNITED STATES DISTRICT COURT

10                    EASTERN DISTRICT OF CALIFORNIA

11

12   JUAN MANUEL MENDEZ,                    Case No.  1:14-cv-01715-DAD-MJS (HC)

13              Petitioner,                 **FINDINGS AND RECOMMENDATION TO
                                            GRANT PETITION FOR WRIT OF HABEAS
14        v.                                CORPUS**

15   DAVID BAUGHMAN, Warden
                                            **THIRTY (30) DAY OBJECTION DEADLINE**
16              Respondent.

17

18

19

20        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

21   corpus under 28 U.S.C. § 2254. David Baughman, Acting Warden of California State

22   Prison, Sacramento, is hereby substituted as the proper named respondent pursuant to

23   Rule 25(d) of the Federal Rules of Civil Procedure. Respondent is represented by Tami

24   M. Krenzen of the Attorney General's Office for the State of California.

25        The petition raises the following claims: (1) the trial court erred in denying

26   Petitioner's Wheeler/Batson motion; (2) the jury did not render an unequivocal verdict of

27   guilt on Count 3; (3) the trial court abused its discretion by denying Petitioner's request

28

for release of juror identifying information; (4) trial counsel was ineffective in failing to request instructions on conspiracy to be an accessory after the fact; (5) in light of the equivocal verdict on Count 3, the firearm enhancement must be stricken; (6) the trial court erred in failing to clarify the verdict or further instruct the jury; (7) Petitioner was improperly convicted of two counts of being an accessory; and (8) the gang enhancement must be stricken.[1]  (ECF No. 1.)

For the reasons stated below, the undersigned will recommend that the petition be granted

## I.    Procedural History

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a judgment of the Superior Court of California, County of Merced. He was initially convicted of conspiracy to commit murder and two counts of accessory after the fact, with gang and firearm enhancements. People v. Mendez, No. F063497, 2013 WL 4830803, at *1–2 (Cal. Ct. App. Sept. 10, 2013). He was sentenced to an indeterminate term of 25 years to life, enhanced by a term of 25 years to life due to the firearm allegation. Id. at *2.

Petitioner appealed his conviction and sentence (Lodged Doc. 2) and, on September 10, 2013, the California Court of Appeal for the Fifth Appellate District reversed one of the accessory counts, vacated a gang enhancement, and otherwise affirmed the judgment (Lodged Doc. 1). Mendez, 2013 WL 4830803, at *23.  Petitioner filed a petition for review with the California Supreme Court. (Lodged Doc. 5.) On November 26, 2013, the California Supreme Court denied the petition. (Lodged Doc. 6.)

Petitioner did not file any state habeas petitions.

Petitioner filed the instant federal habeas petition on October 8, 2014. (ECF No. 1.) Respondent filed an answer to the petition on May 1, 2015. (ECF No. 20.) Petitioner

---

[1] Petitioner presents no argument on claims 7 and 8. As described below, Petitioner was provided relief on these claims in state court. Accordingly, they are moot. Bailey v. Del Papa, 237 F. App'x 280, 281 (9th Cir. 2007) (finding adjudication of habeas claim unnecessary where state court had already granted relief). They therefore are not addressed further herein.

filed a traverse on July 10, 2015. (ECF No. 24; see also ECF No. 27.) The matter stands ready for adjudication.

## II.    Factual Background

The following facts are taken from the Fifth District Court of Appeal's September 10, 2013, opinion and are presumed correct. 28 U.S.C. § 2254(e)(1).

> On the night of the shooting, DeAngelo and J.S. were sitting on a bench in an apartment complex near a basketball court. They were approached by three armed Hispanic males. Shots were fired, resulting in the death of DeAngelo. J.S. survived, despite being shot twice. The prosecution presented evidence suggesting the shooting was gang related, although neither DeAngelo nor J.S. was a gang member.

> A witness, who went to high school with Mendez, identified Mendez as the driver of the vehicle that transported the shooters to and from the apartment complex. Mendez was arrested that night and gave the police a statement admitting his involvement in the shooting. We will summarize Mendez's statement, which was played for the jury, to explain his defense and the basis for his claimed inability to identify the shooters.

> Mendez initially claimed he did not know why he was being interrogated and that he was at home asleep at the time of the shootings (10:00 p.m. to 11:00 p.m.). He denied driving the vehicle used to transport the shooters that night. He denied being at the scene, even after being told a witness had identified him and the vehicle he was driving.

> A search of Mendez's home resulted in the discovery of the guns used in the shooting being found under Mendez's bed. Mendez's story quickly changed. Mendez said he received a call asking if he could give the caller a ride. The caller, whom Mendez stated he did not know, said that Fire had told him to call Mendez for a ride. Mendez knew Fire from a high school he attended for a short while.

> Mendez picked up Fire, the caller, and a third man near a store. Fire first stated the three were going to a party, but then asked Mendez to stop at the apartment complex. When the three men exited the vehicle, they used their shirts to cover their faces, except for their eyes. Mendez waited about 10 minutes. He heard approximately five gunshots and then

3

the three men came running out of the complex. They told Mendez to "just go, just go." Mendez drove to a park. The three men said there were two Black guys at the apartment complex. An argument started and shots were fired. The three men told Mendez to hide the guns—two pistols and a shotgun. Mendez claimed he did not know any of the three men except for Fire.

Mendez dropped off the three at the same store at which he had picked them up and then dropped off the guns at his house. After Mendez got home, a different friend called for a ride. Mendez did not want to take the truck because it had been used in the shooting, so he took his brother's car.

The prosecution contended Mendez was guilty as an aider and abettor to the murder of DeAngelo and the attempted murder of J.S., and that Mendez conspired with the shooters to commit the crime. Mendez argued he was merely giving a friend a ride and did not know the three men were going to shoot anyone that night. He acknowledged that his actions after the shooting would make him guilty of being an accessory after the fact, in violation of section 32, but asserted he was not guilty of the three charged crimes.

Mendez, 2013 WL 4830803, at *1–2.

## III.    Jurisdiction and Venue

Relief by way of a writ of habeas corpus extends to a prisoner under a judgment of a state court if the custody violates the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered a violation of his rights as guaranteed by the U.S. Constitution. Petitioner was convicted and sentenced in this district. 28 U.S.C. § 2241(d); 2254(a). The Court concludes that it has jurisdiction over the action and that venue is proper.

## IV.    Applicable Law

The petition was filed after April 24, 1996 and is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). Under AEDPA, federal

4

habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### A.     Standard of Review

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-06). "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted). The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009). For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).

A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75-76 (quoting Williams, 529 U.S. at 409-10); Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). "[A]n unreasonable application of federal law is different from an incorrect application of federal law." Harrington v. Richter 562 U.S. 86, 101 (2011) (citing Williams, 529 U.S. at 410) (emphasis in original). "A state

5

court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).

### B. Requirement of Prejudicial Error

In general, habeas relief may only be granted if the constitutional error complained of was prejudicial. That is, it must have had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require a showing of prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984). Furthermore, claims alleging ineffective assistance of counsel are analyzed under the Strickland prejudice standard; courts do not engage in a separate analysis applying the Brecht standard. Strickland v. Washington, 466 U.S. 668 (1984); Avila v. Galaza, 297 F.3d 911, 918, n.7 (2002); Musalin v. Lamarque, 555 F.3d 830, 834 (9th Cir. 2009).

### C. Deference to State Court Decisions

"[S]tate courts are the principal forum for asserting constitutional challenges to state convictions," not merely a "preliminary step for a later federal habeas proceeding." Richter, 562 U.S. at 103. Whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what

arguments or theories supported or . . . could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Id. at 102. In other words:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 103. Thus, the Court may issue the writ only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Id. at 102.

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). Thus, the court will "look through" a summary denial to the last reasoned decision of the state court. Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006). Furthermore, the district court may review a habeas claim, even where the state court's reasoning is entirely unexplained. Richter, 562 U.S. at 98. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

**V.      Review of Petition**

   **A.      Claim One: Discrimination in Jury Selection**

Petitioner contends that the prosecutor exercised peremptory challenges in a discriminatory manner that removed four Hispanic jurors, and that the trial court

7

improperly denied Petitioner's <u>Batson</u> motion challenging the prospective jurors' removal.

### 1.    State Court Decision

Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. <u>See</u> <u>Ylst</u>, 501 U.S. at 804-05. Additionally, to the extent that the California Court of Appeal's decision "adopts or substantially incorporates the reasoning from a previous state court decision, we may consider both decisions to 'fully ascertain the reasoning of the last decision.'" <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir. 2007).

In ruling on this claim, the Fifth District Court of Appeals explained:

> Mendez made two motions for a mistrial based on the prosecutor's exercise of peremptory challenges. The first motion was made after the prosecutor exercised his first two peremptory challenges to Prospective Jurors Nos. 1399 and 5225. The second motion was made after the prosecutor exercised a total of 11 peremptory challenges, including Prospective Jurors Nos. 3307 and 4454.
>
> The primary ground for Mendez's motions was the fact that each of the challenged potential jurors was Hispanic. After each motion the trial court found Mendez had made a prima facie showing the prosecutor was exercising his peremptory challenges in a discriminatory manner. After the prosecutor explained his reasons for the use of the peremptory challenges, the trial court found there were nondiscriminatory reasons for the prosecutor's challenges and denied the motions. Mendez argues the trial court's ruling was erroneous.
>
> **A. The Law**
>
> The California Supreme Court recently set forth the applicable legal standards when a <u>Batson</u>/<u>Wheeler</u> motion is made.
>
> "A prosecutor's use of peremptory challenges to excuse prospective jurors on the basis of group bias, including on

grounds of race or ethnicity, violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution. [Citations.] Under <u>Batson</u>, supra, 476 U.S. 79, such practice also violates the defendant's right to equal protection under the Fourteenth Amendment. [Citations.]

"'In ruling on a motion challenging the exercise of peremptory strikes, the trial court follows a three-step procedure. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" [Citation.]' [Citation.]

"'A prosecutor asked to explain his conduct must provide a "'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." [Citation.] "The justification need not support a challenge for cause, and even a 'trivial reason,' if genuine and neutral, will suffice." A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons.' [Citation.] '[B]ut race-based decisions are not constitutionally tolerable.' [Citations.]

"Therefore, 'at the third stage of the <u>Wheeler</u>/<u>Batson</u> inquiry, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. [Citation.]' [Citations.]

""Review of a trial court's denial of a <u>Wheeler</u>/<u>Batson</u> motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's

justifications for exercising peremptory challenges "'with great restraint.'" [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]'" [Citation.]' [Citation.]

"'"'The trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine.'" [Citation.] "'All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory.' [Citation.] A reason that makes no sense is nonetheless 'sincere and legitimate' as long as it does not deny equal protection. [Citation.]" [Citation.]' [Citation.]

"'"As part of our analysis, we consider as 'bearing on the trial court's factual finding regarding discriminatory intent' [citation] the comparisons of prospective jurors challenged and unchallenged that defendant expounds in his briefs, though few if any of these comparisons were made in the trial court. At the same time, 'we are mindful that comparative juror analysis on a cold appellate record has inherent limitations.' In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved. 'Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding.' [Citation.]" [Citation.]' [Citation.]" (People v. DeHoyos (2013) 57 Cal.4th 79, 101–103.)

**B. Motion No. 1**

The first motion was made after the prosecutor exercised his first two peremptory challenges on Prospective Jurors Nos. 1399 and 5225. We begin by reviewing the proceedings leading up to these two challenges.

# The Jury Questionnaire

Each potential juror was presented with a jury questionnaire to complete several days before jury selection began.

## *Prospective Juror No. 1399*

Prospective Juror No. 1399 was a retired 69–year–old married male who lived at home with his wife. He has seven grown children. He stated he graduated from high school but did not attend college, had not served in the military, denied past jury service, had been arrested for solicitation and apparently sustained a conviction of some type, and had a nephew who was "run over" by a drunk driver and a cousin and a brother-in-law who were murdered; he also stated he had been the victim of auto theft. He testified as a character witness for a coworker who had been charged with murder. He denied hearing about the case in the media and denied any negative feelings towards law enforcement. He strongly disagreed with the statement that "The courts are trustworthy," and stated that a person who acted as a lookout for a burglar should be just as liable as the burglar if the two planned the crime together. However, he felt a getaway driver would not be as guilty as the person who stabbed a victim unless the driver could have stopped the crime.

## *Prospective Juror No. 5225*

Prospective Juror No. 5225 was a 34-year-old mother of six children who was employed as a family service representative. She had graduated from high school and attended college, during which time she was enrolled in several criminal justice classes. She denied any past jury experience. Her brother, son, and ex-husband had been charged with crimes, although the types of crimes were not stated. She stated she had been the victim of domestic violence at the hands of her ex-husband, which probably resulted in charges against him. He shot at her and threatened her with a gun several times. She also testified in her cousin's case when he apparently was charged with sexual assault.

She had seen some information in the media about the case, and one of her nephews stated he knew the victim from high school. The information made her sad. Her brother had a tattoo on his forearm that read "M St. Mob." She experienced migraine headaches and indicated they might make it difficult

11

for her to serve on the jury, although she had medication for the condition.

She acknowledged that a lookout or a getaway driver could be liable for the crime committed by another perpetrator, depending on the circumstances involved.

**Voir Dire**

The trial court began voir dire by asking all potential jurors in the jury box general questions about their ability to serve as jurors. In addition, the parties were permitted limited voir dire.[FN3]

> FN3: Each party was given 30 minutes to voir dire the initial 27 potential jurors called to the jury box. For cause and peremptory challenges were then exercised until only 11 potential jurors were left in the jury box. The trial court then called 16 additional potential jurors from the panel. Each party was then given 15 minutes to conduct voir dire on any of the 27 potential jurors now in the jury box. This process was repeated until a jury was selected.

***Prospective Juror No. 1399***

Prospective Juror No. 1399 did not respond to any of the trial court's questions. The prosecutor began voir dire by asking general questions of the entire panel about witnesses. He specifically asked Prospective Juror No. 1399 how he would determine whether a witness was believable. Prospective Juror No. 1399 responded that he would base his analysis on past experiences in interacting with people. That was the only question asked of this prospective juror by either attorney.

***Prospective Juror No. 5225***

Prospective Juror No. 5225 responded to two questions posed by the trial court. First, she indicated that one of the police officers, who was a potential witness in the trial, had been a friend of her husband's for a long time. She denied the relationship would have any effect on her ability to be impartial.

She also explained that she knew the district attorney because their sons were friends. She again denied that the relationship would have any effect on her ability to be impartial.

Neither attorney asked Prospective Juror No. 5225 any questions on voir dire.

## The Prosecutor's Justification for the Peremptory Challenges

The prosecutor's explanation for his decision to exercise a peremptory challenge was somewhat disjointed. It appears that someone in the district attorney's office had reviewed the jury questionnaires before jury selection began and had given each questionnaire a "grade," which indicated the desirability of that particular juror serving on the panel. It also appears that the prosecutor trying the case did not grade the questionnaires and based his decision whether to accept or reject a juror largely on the grades given to the questionnaires.

While the use of such a grading system does not necessarily violate any of Mendez's constitutional rights, a constitutional violation would occur if the grades were based on race. The record, however, does not contain any evidence on how the grades were assigned; therefore, we have no basis to conclude the grading system violated Mendez's constitutional rights.

Because we do not know on what criteria the grading system was based, we must base our review solely on the various reasons identified by the prosecutor for the challenges. The prosecutor noted that Prospective Juror No. 1399 stated on his questionnaire that he had been convicted of misdemeanor solicitation, the questionnaire was full of misspellings, and the prospective juror stated he had testified as a character witness for a defendant accused of murder. The prospective juror also strongly disagreed with the statement that the courts were trustworthy. Finally, he indicated he did not feel accomplices should be punished the same as a perpetrator.

The prosecutor noted that Prospective Juror No. 5225 stated she had taken some criminal justice classes, which caused the prosecutor concern because such jurors sometimes make decisions based on what they think the law is rather than the law given to them by the trial court. Prospective Juror No. 5225 also stated she would not have any problem deciding the case because of her religious beliefs, but she might not be able to impose the death penalty because of those beliefs. The prosecutor explained that this caused concern that the prospective juror might make decisions on her religious beliefs and not the law. The prospective juror also said that

13

her brother, son, and ex-husband had been charged with crimes, causing concern about bias against law enforcement. The prospective juror also had been a victim of domestic violence and had been a witness in her cousin's sexual assault case, both of which caused the prosecutor concern. Finally, the prospective juror's brother apparently was in a gang, since he had a gang tattoo on his arm and this gang tattoo was for the same gang involved in this case.

### The Trial Court's Ruling

The trial court found there were race-neutral reasons for the prosecutor's exercise of the peremptory challenges and denied the motion with little explanation.

### Analysis

We agree with the trial court's conclusion. The voir dire did not provide any useful information for either attorney, so the decision to exercise peremptory challenges was based almost entirely on the jury questionnaires, which supported for the most part the prosecutor's justifications for the challenges. Prospective Juror No. 1399 stated in his questionnaire that he had been arrested for solicitation, had testified as a character witness for a coworker charged with murder, did not feel the trial courts were trustworthy, and did not feel an accomplice should be as liable as the perpetrator. These were all race-neutral reasons for exercising a peremptory challenge.

Prospective Juror No. 5225's questionnaire also supported the prosecution's justifications. She stated in her questionnaire that her brother had a gang tattoo, a strong indication he was in a criminal street gang. She also stated several relatives had been charged with crimes, her religious views would interfere with her ability to impose the death penalty, and she had taken several criminal justice classes. Each of these reasons was race-neutral and supported the trial court's ruling.

### C. Motion No. 2

The second motion was made after the potential jurors excused from the panel were replaced with new potential jurors from the venire. Both sides exercised numerous peremptory challenges. Mendez made the second motion after the prosecutor exercised his ninth challenge against Prospective Juror No. 3307. Mendez asserted the ninth

peremptory challenge and the sixth peremptory challenge used against Prospective Juror No. 4454 were based on race.

## The Jury Questionnaire

### *Prospective Juror No. 3307*

Prospective Juror No. 3307 was a 33-year-old single Hispanic female with three children. She had graduated from college and vocational school. She had never served on a jury. Neither she nor a family member had ever been charged with a crime, nor had she been a victim of a crime other than when someone broke into her house.

She had not heard anything about the case from media reports.

She "Somewhat Disagree[d]" that police and the courts are trustworthy. She would judge police officer testimony the same as any other witness. She denied any gang knowledge or involvement for either herself or her family.

She felt that accomplices were as guilty as the perpetrator.

### *Prospective Juror No. 4544*

Prospective Juror No. 4544 was a 19-year-old single Hispanic female. She had graduated from high school and was attending college. She had never served on a jury. Neither she nor a family member had been charged with a crime. She had never been a victim of a crime. She did not feel that street gangs were a positive activity for youth.

She might have read about the crime in newspapers or discussed it with friends, but she could not recall anything she had read or heard. She had not formed any opinion about the case.

She had had no contact with law enforcement, but she felt that sometimes police officers did not see the whole situation before they decided not to act. She stated she would not judge a police officer's testimony by the same rules as other witnesses because a police officer may know the law and will see "loop holes."

She knew gangs probably existed in her home town, but she did not know any gang members or of any problems they

caused in her neighborhood. She did not have any friends or family members who were involved in gangs.

She stated she would feel obligated to reach a verdict because that was the vote of the majority, but denied she would vote a certain way because she wanted to have a unanimous verdict.

She did not feel that a lookout or getaway driver should be punished the same as the perpetrator, but she felt there should be some punishment (perhaps a fine).

## Voir Dire

### *Prospective Juror No. 3307*

Prospective Juror No. 3307 did not respond to any of the trial court's questions. The prosecutor asked Prospective Juror No. 3307 a general question about circumstantial evidence, to which the prospective juror responded appropriately. Defense counsel did not ask any questions of Prospective Juror No. 3307.

### *Prospective Juror No. 4454*

Prospective Juror No. 4454 did not respond to any of the trial court's questions, nor did either attorney question this prospective juror during voir dire.

## The Prosecutor's Justification

The prosecutor noted Prospective Juror No. 3307 had failed to answer a question about whether she or a family member or a close friend had been subject to a violent act, even if that act was not a crime. He also noted the prospective juror somewhat disagreed with the statement that courts are trustworthy and strongly disagreed with the statement that if the prosecutor failed to prove his case beyond a reasonable doubt, the Constitution required the jury to find the defendant not guilty.

The prosecutor felt that Prospective Juror No. 3307's explanation to the question about accomplice liability was unclear. The question asked whether a person who acted as a getaway driver was just as guilty as the perpetrator who stabbed the victim. The prospective juror responded, "I don't know how to answer this question. [D]oes the drive[r] know the person is going to stab another person[?] If so he is guilty."

16

For Prospective Juror No. 4454, the prosecutor noted the prospective juror stated she might have to look away at a "really gruesome" picture. In addition, she answered both questions about accomplice liability by stating she did not think the accomplice was as guilty as the perpetrator. The prosecutor identified accomplice liability as a significant issue in the case and explained that anyone who did not think an accomplice would be as guilty as a perpetrator was unacceptable to the prosecution.

### The Trial Court's Ruling

The trial court focused on Prospective Juror No. 3307, apparently concluding that the prosecutor had a valid reason for excusing Prospective Juror No. 4454. The trial court noted the prosecutor's stated reasons were weak but found that from a subjective standpoint, skepticism about the fairness of the criminal justice system was a legitimate basis for exercising a peremptory challenge (citing <u>People v. Calvin</u> (2008) 159 Cal.App.4th 1377, 1386 (Calvin)). Accordingly, the trial court denied the motion, concluding there was not purposeful discrimination under the totality of the circumstances.

### Analysis

We agree with the trial court's conclusion that the peremptory challenge exercised on Prospective Juror No. 4454 was supported by a race-neutral reason. The record supports the prosecutor's statement that Prospective Juror No. 4454 expressed doubts about accomplice liability. Since the prosecution of Mendez was based entirely on accomplice liability, sound trial strategy supports the conclusion that the prosecutor would excuse a juror who expressed doubts about the concept.

Like the trial court, we think the prosecutor's explanation for the challenge of Prospective Juror No. 3307 is much weaker. Unlike the prosecutor, we see the prospective juror's response to the question about accomplice liability as clear and concise (although grammatically incorrect), and that it expressed a view consistent with the law.

We also think the prosecutor's concern that the prospective juror failed to complete a question about whether she or anyone she knew had been a victim of a violent act is disingenuous. The prospective juror answered several questions related to her experiences with violent crimes, and

she denied that she, a family member, or a close friend ever had been the victim of a violent crime. She also denied that she, a family member, or a close friend ever had witnessed a violent act.

From these two answers, the prosecutor easily could have inferred the answer to the omitted question. Or, if the prosecutor truly was concerned, he could have questioned Prospective Juror No. 3307 about the omission. The prosecutor's failure to explain to the trial court why this omission was important, and his failure to question the prospective juror about the omission, strongly suggests this proffered explanation for the challenge was not genuine.

Similarly, the prosecutor's identification of Prospective Juror No. 3307's response to the question about reasonable doubt does not appear to be genuine. The questionnaire in this section made a statement and asked the prospective juror to respond to the statement with one of four responses—(1) strongly agree, (2) somewhat agree, (3) somewhat disagree, and (4) strongly disagree. The statement to which the prosecutor referred was "If the District Attorney does not prove his case beyond a reasonable doubt the Constitution requires that a juror find the defendant 'not guilty.' Please share how you feel about this principal." Prospective Juror No. 3307 responded that she strongly disagreed with the statement, indicating that she felt the prosecution's burden of proof should be lessened. Since this was a position highly favorable to the prosecution, this response by Prospective Juror No. 3307 would not explain the decision to exercise a peremptory challenge to this juror.

The final ground cited by the prosecutor for this challenge was Prospective Juror No. 3307's response to another statement in the questionnaire. The statement in the questionnaire was "The courts are trustworthy." Prospective Juror No. 3307 responded that she somewhat disagreed with the statement. As the trial court noted in making its ruling, distrust of the court system is a valid ground for exercising a peremptory challenge. (Calvin, supra, 159 Cal.App.4th at p. 1386.) Since Prospective Juror No. 3307's response suggested she distrusted the court system, we conclude the prosecutor provided a valid, race-neutral ground for exercising a peremptory challenge to Prospective Juror No. 3307 that is supported by the record.

18

**D. Additional Contentions**

Citing <u>People v. Taylor</u> (2010) 48 Cal.4th 574, Mendez argues that because the prosecutor did not engage "in more than desultory voir dire, or indeed to ask them any questions at all" we should conclude the peremptory challenges were based on the challenged juror's race. He notes the prosecutor did not ask any questions of Prospective Jurors Nos. 5225 and 4544 and asked only superficial questions of Prospective Jurors Nos. 1339 and 3307. None of those questions related to the justification for the peremptory challenge. Mendez argues that if the prosecutor was concerned about the responses in the questionnaires, he would have questioned the excused prospective jurors on the topics that caused him concern. Mendez asserts the failure of the prosecutor to do so "is powerful evidence that his alleged reasons as to all four prospective jurors were not sincere, and were pretextual."

Taylor noted the failure to ask any voir dire questions of a potential juror normally is relevant to the prosecutor's motivation, but concluded the issue was irrelevant in that case because the trial court did not allow either attorney to conduct voir dire. (<u>Taylor</u>, supra, 48 Cal.4th at p. 615.) The Supreme Court cited <u>People v. Kelly</u> (2007) 42 Cal.4th 763 as authority for the proposition that the failure to voir dire a potential juror may be relevant, but <u>Kelly</u> made the statement in the context of the first part of the <u>Batson</u>/<u>Wheeler</u> analysis (deciding whether the defendant made a prima facie showing that the prosecutor utilized his peremptory challenges for discriminatory purposes). (<u>Kelly</u>, at p. 779.) <u>Kelly</u>, in turn, cited <u>People v. Bonilla</u> (2007) 41 Cal.4th 313, 341 as authority for the proposition. <u>Bonilla</u> also made the statement in the context of deciding whether the defendant had made a prima facie showing of discrimination. <u>Bonilla</u>, in turn, cited <u>Wheeler</u> as authority for the proposition. (Bonilla, at p. 342.) <u>Wheeler</u> also made the statement in the context of determining whether the defendant had made a prima facie showing of discrimination. (<u>Wheeler</u>, supra, 22 Cal.3d at pp. 280–281.) Therefore, these cases do not stand for the proposition that the lack of voir dire is relevant in determining whether the prosecution's stated reasons for excusing a juror are a pretext.

However, <u>Miller–El v. Dretke</u> (2005) 545 U.S. 231, also cited by Mendez, supports the proposition. Like the case before us, the panel was provided with a questionnaire and was subject to voir dire by the attorneys. When the prosecutor in Miller–El

19

was asked to provide a race-neutral explanation for a peremptory challenge against an African–American potential juror, the explanation he gave as the sole basis for the challenge misrepresented the answers on the potential juror's questionnaire. When this discrepancy was pointed out, the prosecutor provided a second reason for the challenge related to the potential juror's disclosure that his brother had been convicted of drug offenses. The Supreme Court found the new reason for the challenge as further evidence of discriminatory intent. "It would be difficult to credit the State's new explanation, which reeks of afterthought. While the Court of Appeals tried to bolster it with the observation that no seated juror was in [the juror's] position with respect to his brother, [citation], the court's readiness to accept the State's substitute reason ignores not only its pretextual timing but the other reasons rendering it implausible. [The juror's] testimony indicated he was not close to his brother, [citation] . . . and the prosecution asked nothing further about the influence his brother's history might have had on [the juror], as it probably would have done if the family history had actually mattered. See, e.g., Ex parte Travis (2000) 776 So.2d 874, 881 (Ala. 2000) ('[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination'). There is no good reason to doubt that the State's afterthought about [the juror's] brother was anything but makeweight." (Miller–El, at p. 246.)

Even with this authority to aid him, Mendez's argument fails. The prosecutor's voir dire of all of the potential jurors was minimal, at best. The time provided for voir dire was limited (30 minutes for the initial panel and 15 minutes when the panel was "restocked"). The prosecutor did not utilize this time to explore concerns raised by the jury questionnaire with any potential juror. He used the voir dire to indoctrinate the potential jurors on the issues that would be presented in the case, without attempting to explore whether the potential juror's position on those issues would affect the potential juror's suitability to serve on the case. Instead, from all appearances, the prosecutor chose to rely on only the grading system utilized by the district attorney's office that was completed before trial.

Finally, Mendez asks us to perform a comparative analysis of the potential jurors who were challenged with the jurors who served on the jury. When we perform this analysis, we are

mindful of the Supreme Court's repeated warnings about such posttrial analysis.

"The rationale for comparative juror analysis is that a side-by-side comparison of a prospective juror struck by the prosecutor with a prospective juror accepted by the prosecutor may provide relevant circumstantial evidence of purposeful discrimination by the prosecutor. [Citations.]" (DeHoyos, supra, 57 Cal.4th at p. 109.) However, "'we are mindful that comparative juror analysis on a cold appellate record has inherent limitations.' [Citation.] 'One of the problems of comparative juror analysis not raised at trial is that the prosecutor generally has not provided, and was not asked to provide, an explanation for nonchallenges. When asked to engage in comparative juror analysis for the first time on appeal, a reviewing court need not, indeed, must not turn a blind eye to reasons the record discloses for not challenging other jurors even if those other jurors are similar in some respects to excused jurors.' [Citation.]" (People v. Elliott (2012) 53 Cal.4th 535, 561.)

The superficial comparative analysis suggested by Mendez is not helpful. Mendez makes vague generalizations about some of the prosecutor's explanations for challenging some of the potential jurors, but does not attempt to explain how a specific juror that the prosecutor challenged compares favorably to a potential juror that remained on the panel. For example, Mendez broadly states that "many seated jurors' views of the criminal justice system and reasonable doubt were similar to those of the dismissed Hispanic prospective jurors," with a long citation to the record. We are left to divine for ourselves to which dismissed potential juror Mendez is referring. Nor is there any attempt to explain how the opinions were similar, or how one of the seated jurors compared to a dismissed potential juror.

Mendez was required to present a reasoned legal analysis supported by citation to relevant legal authority and citation to facts in the record that support his argument. (Kim v. Sumitomo Bank (1993) 17 Cal.App.4th 974, 979.) A competent comparative analysis requires Mendez to identify a seated juror who had the same or similar answers to the questionnaire as an excused juror on all relevant topics, not simply an isolated issue. We take Mendez's failure to do so to be a concession that a thorough comparative analysis does not support his argument.

Also, the record indicates that several Hispanic surnamed individuals served on the jury. Mendez makes no attempt to rebut any obvious impact this would have on a comparative analysis.

**E. Conclusion**

There is substantial evidence in the record to support the race-neutral reasons cited by the prosecutor for his decision to exercise peremptory challenges on Prospective Jurors Nos. 1399, 5225, 3307, and 4544. The trial court made a sincere and reasoned attempt to evaluate the nondiscriminatory justifications offered by the prosecutor. Exercising the great restraint with which we must review Batson/Wheeler claims, we conclude that the trial court did not err in denying Mendez's motions.

The trial court's analysis, however, was made more difficult because of the procedure utilized by the district attorney's office. There is nothing inherently wrong with grading potential jurors based on their responses on a jury questionnaire. However, when the attorney trying the case does not participate in this process, as appears to be the case here, that attorney is left to attempt to justify a peremptory challenge without knowing its basis. The justifications offered, therefore, naturally will appear to be less credible than those offered by an attorney who decided to exercise the peremptory challenge. It also is conceivable the trial court may require the attorney or attorneys in the district attorney's office who graded the questionnaire to attend the motion to explain their grading system. Such a process would allow the trial court to ensure the challenges were based on a race-neutral reason, although the process would be inefficient.

Mendez, 2013 WL 4830803, at *2-11.

## 2.    Legal Standard

Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal and state trials is governed by the standard established by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 89 (1986).

In Batson, the United States Supreme Court set out a three-step process to determine whether a peremptory challenge is race-based in violation of the Equal Protection Clause. Purkett v. Elem, 514 U.S. 765, 767 (1995). First, the defendant must

22

make a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis of race. Id. That is, the defendant must demonstrate that the facts and circumstances of the case "raise an inference" that the prosecution has excluded venire members from the petit jury on account of their race. Id. If a defendant makes this showing, the burden then shifts to the prosecution to provide a race-neutral explanation for its challenge. Id. At this second step, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Id., quoting Hernandez v. New York, 500 U.S. 352, 360 (1991). Finally, the third step requires the trial court to determine if the defendant has proven purposeful discrimination. And "[s]ince the trial judge's findings in the context under consideration here largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." Batson, 476 U.S. at 98 n.21.

In evaluating the race-neutral explanation, the Court must keep in mind that discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. See Hernandez, 500 U.S. at 360 (no discriminatory intent where Latino jurors dismissed because of possible difficulty in accepting translator's rendition of Spanish language testimony). The finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility. See Rice v. Collins, 546 U.S. 333, 340-41 (2006); Lewis v. Lewis, 321 F.3d 824, 830 (9th Cir. 2003). "[T]he court must evaluate the prosecutor's proffered reasons and credibility under 'the totality of the relevant facts,' using all the available tools including its own observations and the assistance of counsel." Mitleider v. Hall, 391 F.3d 1039, 1047 (9th Cir. 2004) (citing Lewis, 321 F.3d at 831). A legitimate reason "is not a reason that makes sense, but a reason that does not deny equal protection." Purkett v. Elem, 514 U.S. 765, 769 (1995). What matters is the "genuineness of the motive" behind the racially neutral explanation, not "the reasonableness of the asserted nonracial motive." Id. "To accept a prosecutor's stated

23

nonracial reasons, the court need not agree with them. The question is not whether the stated reason represents a sound strategic judgment, but 'whether counsel's race-neutral explanation for a peremptory challenge should be believed.'" Kesser v. Cambra, 465 F.3d 351, 359 (9th Cir. 2006) (citing Hernandez, 500 U.S. at 365).

When determining whether a prosecutor's professed race-neutral reasons for striking a juror were pretextual, Batson requires an inquiry into "the totality of the relevant facts about a prosecutor's conduct." Currie v. McDowell, 825 F.3d 603, 610 (9th Cir. 2016); Kesser, 465 F.3d at 359. However, AEDPA "'imposes a highly deferential standard for evaluating state-court rulings'" and "'demands that state-court decisions be given the benefit of the doubt.'" Felkner v. Jackson, 562 U.S. 594, 598 (2011) (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)). More specifically, the findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review, see Purkett, 514 U.S. at 769, as are the findings of the state appellate court, see Mitleider, 391 F.3d at 1050; Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir. 2004). Under AEDPA, this means a state court's findings with respect to discriminatory intent are presumed sound unless a petitioner rebuts the presumption by clear and convincing evidence. Miller-El v. Dretke, 545 U.S. 231, 240, (2005). "[The federal court] must defer to the [state court's] conclusion that there was no discrimination unless that finding 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Cook v. LaMarque, 593 F.3d 810, 816 (9th Cir. 2010) (citing 28 U.S.C. § 2254(d)(2)). A federal habeas court may grant relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge." Rice, 546 U.S. at 338.

**3.    Analysis**

a.    Step One

Because the trial court proceeded to the second and third steps of the Batson analysis, this Court need not review the first step. Hernandez v. New York, 500 U.S. 352,

359 (1991) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").

### b.    Step Two

Batson's second step requires the prosecutor to offer race-neutral reasons for peremptory strikes. "At Step Two, the state must both (1) assert that specific, race-neutral reasons were the <u>actual</u> reasons for the challenged strikes, and (2) offer some evidence which, if credible, would support the conclusion that those reasons were the <u>actual</u> reasons for the strikes." <u>Shirley v. Yates</u>, 807 F.3d 1090, 1104 (9th Cir. 2015), <u>as amended</u> (Mar. 21, 2016). Hypothetical or theoretical reasons will not suffice. <u>Miller-El v. Dretke</u>, 545 U.S. 231, 233 (2005) ("A <u>Batson</u> challenge does not call for a mere exercise in thinking up any rational basis.") Again, this step requires "evidence of the prosecutor's <u>actual</u> reasons for exercising her peremptory challenges." <u>Paulino v. Harrison</u> ("<u>Paulino II</u>"), 542 F.3d 692, 699 (9th Cir. 2008). "[A] prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." <u>Miller-El</u>, 545 U.S. at 252.

As the Supreme Court has explained:

> The <u>Batson</u> framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question.

<u>Johnson v. California</u>, 545 U.S. 162, 172 (2005) (citing <u>Paulino v. Castro</u> ("<u>Paulino I</u>"), 371 F.3d 1083, 1090 (9th Cir. 2004) ("It does not matter that the prosecutor might have had good reasons . . . what matters is the real reason [the jurors] were stricken.") (emphasis deleted) and <u>Holloway v. Horn</u>, 355 F.3d 707, 725 (3d Cir. 2004) ("[S]peculation . . . 'does not aid our inquiry into the reasons the prosecutor actually

harbored' for a peremptory strike'")); <u>see also</u> <u>Paulino II</u>, 542 F.3d at 699 ("Evidence of a prosecutor's actual reasons may be direct or circumstantial, but mere speculation is insufficient."); <u>Shirley</u>, 807 F.3d at 1104 ("Evidence that a good reason for a strike existed is insufficient in itself at Step Two.").

In some instances, such as where a <u>Batson</u> challenge is not raised until some time after trial has concluded, the prosecutor may have no independent recollection of the actual reasons for striking the jurors in question, and may be called upon to reconstruct his or her reasons. <u>See</u> <u>Paulino II</u>, 542 F.3d at 700. In so doing, the prosecutor may refresh her recollection with reference to the voir dire transcript, jury selection notes, or other contemporaneously made statements regarding the contested strikes. <u>Id.</u> at 700-01. Or, she may present circumstantial evidence of her reasons, such as inferences drawn from the voir dire transcript combined with assertions regarding the prosecutor's typical or usual practices or approach. <u>Shirley</u>, 807 F.3d at 1104-05. However, a prosecutor's mere speculation as to good reasons for striking a juror, which constitute nothing more than guesses, will not meet the state's burden at step two. <u>Id.</u>

**Here, the record suggests that the prosecutor did not present the trial court with the actual reasons for striking the contested jurors.** On the first <u>Batson</u> motion, when asked to give his reasons for the strikes, he stated, "I'm looking at a scoring that we did probably based on the questionnaire prior to the jurors coming in." (RTA 2 at 316.) He then instructed his assistant to "[p]ull their card[s]" (RTA 2 at 316), and proceeded to review the questionnaires and identify concerns (RTA 2 at 316-321.) In some instances, he was unable to read the statements that he believed were cause for concern. (RTA 2 at 318.) Ultimately, he stated "we're just sort of scoring these people and looking at the totality of these answers." (RTA 2 at 321.) Defense counsel pointed out that the prosecutor had gone through the questionnaires in an exhaustive fashion and questioned whether, in so doing, the prosecutor was offering actual, or merely hypothetical, reasons:

> [H]e wasn't telling you anything from him to you. He was looking back at things that we don't know if he considered or Ms. Webb considered or somebody else in his office considered. But certainly for [the prosecutor] himself, those were, you know, not things that jumped up into his head while he took those actions.

(RTA 2 at 323-34.) The trial court did not expressly resolve whether the proffered reasons were actual or credible, stating only that they were race-neutral. (RTA 2 at 324.)

The prosecutor's response to the second <u>Batson</u> motion was more ambiguous. When asked to state the reasons he excused the two contested jurors, the prosecutor took time to examine and tab the juror questionnaires for those individuals. (RTA 2 at 376.) He then listed off specific responses given by Juror No. 3307 that he identified as problematic and stated, "[t]hose were our reasons." (RTA 2 at 377.) With regard to Juror No. 4544, the prosecutor stated he was "going to go page by page and looking at what we spotted." (RTA 2 at 378.) In particular, he identified questions on accomplice liability as being "really significant" in the prosecution's selection of jurors and in particular in the prosecution's decision to strike Juror No. 4544. (RTA 2 at 388-90.) The Court ultimately concluded that "[t]he rating system that counsel has relied on, I think with the help of Ms. Webb, who has gone through them, as well, certainly can be misinterpreted." (RTA 2 at 394.) Although the court noted that the reasons proffered by the prosecution as to this motion were "thinner than the last one," the court ultimately concluded that the reasons were sufficient. (RTA 2 at 393, 396.) The trial court repeatedly affirmed that it was interested in the prosecutor's subjective reasons and whether those reasons were sufficient or genuine. However, it is unclear whether the trial court determined that the prosecutor had proffered actual reasons, or merely hypothetical reasons that could support a subjective, non-discriminatory reason to strike the contested jurors.

On review, the Court of Appeal described the prosecutor's explanation for the strikes as "disjointed." The court surmised that someone other than the prosecutor had reviewed and "graded" the juror questionnaires prior to jury selection, and that the

1  prosecutor based his strike decisions largely on these grades. Mendez, 2013 WL
2  4830803, at *5. The court went on to note that "a constitutional violation would occur if
3  the grades were based on race," but also that the record contained "no evidence on how
4  the grades were assigned." In the absence of evidence regarding the grading system,
5  the court concluded it had "no basis to conclude the grading system violated Mendez's
6  constitutional rights." Instead, the court based its review "solely on the various reasons
7  identified by the prosecutor for the challenges." Id. at *5-6.

8         In sum, the trial court did not expressly determine whether the prosecutor had
9  stated his actual reasons for striking these jurors. The Court of Appeal concluded he had
10 not, stating there was "no evidence on how the grades were assigned." This conclusion
11 is entitled to deference, 28 U.S.C. § 2254(d)(2), (e)(1), and even if it is not, the Court
12 finds no basis in the record to conclude that the trial court had before it the prosecutor's
13 actual reasons for exercising these challenges. The prosecutor struck the jurors based
14 on a score developed by someone else in the prosecutor's office. The prosecutor
15 expressed uncertainty as to how that score was developed. (RTA 2 at 316 ("I'm looking
16 at a scoring that we did probably based on the questionnaire prior to the jurors coming
17 in.")). He assumed that the score was derived from the juror's questionnaires, then
18 perused those questionnaires for responses that he believed may have been the basis
19 for the strikes. He did not, at any point, explain how any particular responses may have
20 factored in to any particular juror's score. And, although he explained that questions
21 regarding accomplice liability were significant to the state's assessment of the jurors, he
22 did not explain how any such responses were weighed in scoring the potential jurors.
23 See Paulino II, 542 F.3d at 701 ("No authority supports the State's claim that pure
24 speculation qualifies as circumstantial evidence of the prosecutor's actual reasons,
25 simply because it was the prosecutor herself who offered the speculation during the
26 course of an evidentiary hearing."). It is of no moment that the prosecutor developed
27 non-discriminatory reasons while reviewing the juror's questionnaires. The prosecutor's
28

proffered reasons amounted to mere "guesswork" supported by "inferences anyone might (or might not) draw" from review of the questionnaires. Shirley, 807 F.3d at 1106.

The Court of Appeal concluded there was no evidence of the prosecutor's actual reasons, and instead based its review "solely" on the hypothetical reasons proffered. Reliance on what the court viewed as the prosecutor's speculation, even where that speculation is supported by other evidence in the record such as the juror questionnaires, is contrary to established Supreme Court law. Miller-El, 545 U.S. at 233. Additionally, the Court of Appeal noted that, due to the lack of evidence regarding the methodology behind the grading system, the court had "no basis to conclude the grading system violated Mendez's constitutional rights." Mendez, 2013 WL 4830803, at *5. However, it is not until Batson's third step that the burden shifts back to the defendant to prove purposeful discrimination. Purkett v. Elem, 514 U.S. 765, 767 (1995) ("If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination."); see also Miller-El II, 545 U.S. at 239 ("The trial court then will have the duty to determine if the defendant has established purposeful discrimination.") (quoting Batson, 476 U.S. at 98). The prosecutor's failure to proffer an actual, race-neutral reason does cut short the defendant's opportunity to prove purposeful discrimination.

Because the Court of Appeal's ruling on the Batson issue is contrary to clearly established Supreme Court law, the Court must "resolve the claim without the deference AEDPA otherwise requires." Crittenden v. Ayers, 624 F.3d 943, 954 (9th Cir. 2010) (quoting Panetti v. Quarterman, 551 U.S. 930, 953 (2007)). The Court does so below in considering step three of the Batson analysis.

c. Step Three

The prosecutor's failure to provide an actual, race-neutral reason for his challenges at step two does not necessarily mean that Petitioner prevails on this claim as a matter of law. See Paulino II, 542 F.3d at 702. Instead, the trial court "must always

reach step three, because it is not until step three of the <u>Batson</u> process that the court 'determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.'" <u>Yee v. Duncan</u>, 463 F.3d 893, 901 (2006). Where, as here, the prosecutor has failed to put forward an actual reason behind the strikes, such failure is evidence of discrimination. <u>Id.</u>; <u>see also</u> <u>Paulino II</u>, 542 F.3d at 702.

Where the state fails to meet its burden of production at step two, the evidence before the district court at step three is comprised of only the prima facie showing and the evidence of discrimination drawn from the state's failure to produce a reason. <u>Paulino II</u>, 542 F.3d at 702. This is sufficient to "establish purposeful discrimination by a preponderance of the evidence in most cases. Indeed, in such cases, there is no race-neutral evidence to weigh." <u>Id.</u>

Here, the prima facie showing is strong enough to cast substantial doubt on the prosecutor's exercise of peremptory challenges. Of particular note, in the first round of peremptory challenges, the prosecutor exercised only two challenges, both against jurors identified as Hispanic. In the second round of challenges, the prosecutor exercised nine challenges, two of which were brought against jurors identified as Hispanic. Although the racial composition of the jury at each stage of jury selection is unclear, the Court notes that the jury that ultimately was seated (including alternates) was comprised of 11 individuals who self-identified as Caucasian or White, and 5 individuals who identified as Hispanic.

Because the prosecutor did not provide actual, race-neutral reasons for his strikes, there is no race-neutral evidence to weigh against the prima facie case. In short, there is nothing to suggest that discrimination was not a factor in scoring and striking the jurors. Accordingly, the Court finds the facts presented here sufficient to establish purposeful discrimination by a preponderance of the evidence. <u>See</u> <u>Paulino II</u>, 542 F.3d at 702.

1    Petitioner is entitled to relief on this claim and the Court will recommend that the

2    petition for writ of habeas corpus be granted on this ground.

3    ///

4        **B.    Claim Two: Lack of Unequivocal Verdict**

5        Petitioner claims that his right to due process was violated because the jury did

6    not render an unequivocal verdict on the conspiracy charge.

7            **1.    State Court Decision**

8        The Fifth District Court of Appeal denied this claim as follows:

> Mendez challenges the verdict on count 3, conspiracy to commit murder. The issue arises because of a lack of clarity in the verdict form.
>
> The seconded amended information charged Mendez with conspiracy in count 3. The count was entitled "Conspiracy to Commit A Crime—Felony." The charging language alleged Mendez conspired to murder DeAngelo and J.S. Five overt acts were listed: (1) coconspirators called Mendez to transport them to the crime scene; (2) Mendez drove the coconspirators to the crime scene; (3) Mendez waited in his car for the coconspirators to shoot the victims; (4) Mendez drove the coconspirators away from the crime scene after the crime was committed; and (5) Mendez hid the co-conspirators' murder weapons after the crime was committed.
>
> At the beginning of the jury selection process, the trial court informed the jury of the crimes, stating, "it is alleged the defendant conspired with others to shoot [DeAngelo and J.S.]" After the jury had been chosen, the information, which was not sent into the jury room, was read to the jury, including count 3, which charged Mendez with conspiring to murder DeAngelo and J.S.
>
> The jury instructions were read to the jury before closing argument. The relevant portions of the instruction stated:
>
> "The defendant is charged in Count Three with conspiracy to commit murder in violation of Penal Code [section] 182. To prove the defendant is guilty of this crime, the People must prove that: One, the defendant intended to agree and did agree with one or more perpetrators to intentionally and unlawfully kill; two, at the time of the agreement, the defendant and one or more alleged members of the

31

conspiracy intended that one or more of them would intentionally and unlawfully kill; three, the defendant and at least one or more or all of them committed at least one of the following overt acts alleged to accomplish the killing: A, unknown conspirators called the defendant to pick them up at a location to transport them to the crime location; B, the defendant drove the co-conspirators to the crime location; C, the defendant waited in his parked vehicle for the co-conspirators to shoot the victims; D, the defendant drove the co-conspirators/shooters away from the crime scene; and, E, the defendant hid the co-conspirators['] murder weapon under his bed and mattress; and, four, at least one of these overt acts was committed in California. To decide whether the defendant committed these overt acts, consider all of the evidence presented about the acts.

"To decide whether the defendant and other alleged members of the conspiracy intended to commit murder, please refer to instruction for Count One, which define that crime.

"The People must prove that the members of the alleged conspiracy had an agreement and intent to commit murder. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit that crime. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

"An overt act is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed-upon crime. The overt act must happen after the defendant had agreed to commit the crime. The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself."

In closing argument, both the prosecutor and defense counsel addressed the count as conspiracy to commit murder. The prosecutor began his closing argument by reminding the jury of the crimes with which Mendez was charged, including "conspiracy to commit murder." In his more detailed discussion of the charges, the prosecutor stated, "Now conspiracy is an agreement by two or more people to commit a crime. And in this case, the conspiracy is to commit first-degree murder and commit first-degree murder on some person out there at the [location of the murder], who turned out to be DeAngelo...." The prosecutor

went on to discuss the evidence he asserted supported the charges, repeatedly referring to the conspiracy to commit murder, and no other possible conspiracy.

When referring specifically to count 3 in his closing argument, defense counsel also focused on a conspiracy to commit murder.

"In order to convict [Mendez] of conspiracy, you must be convinced beyond a reasonable doubt that [Mendez] intended to agree and did agree to kill another human being and that his actions were premeditated. That's why we're here. That's what this trial is about.

"In other words, the District Attorney has to prove to you that [Mendez] knew what the others were going to do, that he was in on it, and he was down for it. And I must have made a typo in there, but that's what I meant to say. He knew what they were going to do, he was in on it, and he was down for it.

"If you find that [Mendez] merely accompanied or associated with members of a conspiracy, but did not intend on murdering or attempting to murder another human being, then [Mendez] is not a member of the conspiracy."

Defense counsel then focused on his main argument on this point—that there was a lack of evidence Mendez participated in a conspiracy to commit the shootings that night. For example, he told the jury, "You must be convinced beyond a reasonable doubt that [Mendez] acted with a common purpose to commit premeditated murder—that's what they've alleged here—and premeditated attempted murder." Defense counsel did not state or suggest Mendez could be convicted in count 3 of conspiracy to commit any crime other than murder.

In his rebuttal argument, the prosecutor referred to the conspiracy count in general terms only. However, he did not state or suggest there was a conspiracy to commit any crime other than murder.

Questions from the jury began early in the deliberation process. One of the first questions posed by the jury requested a diagram be sent into the jury room that apparently was created during opening statements and listed all of the charges. The trial court refused the request because the diagram had not been entered into evidence and it did not include the accessory allegations. [FN4] Instead, the trial

court responded to the question by informing the jury it should "Consult jury instructions and/or verdict forms."

[FN4] It appears the accessory allegations were added sometime during the trial.

Possible issues with the verdict form were first recognized when the jurors raised the question of whether they could find Mendez guilty of accessory instead of, or in addition to, the murder charges. In a discussion that took place outside the presence of the jury, the trial court recognized there would be a possible inconsistency in the verdict if the jury found Mendez not guilty of murder or attempted murder but guilty of being an accessory and guilty of conspiracy to commit murder. The trial court explained that the accessory verdicts would indicate the jury found that Mendez did not know the other individuals in his car went to the apartment complex to murder someone, while the conspiracy count would require the jury to conclude he agreed before the murder was committed to participate in a plan to commit the murders. These two positions contradict each other. The trial court did not attempt to resolve the issue, even though it recognized it might arise. The jury never asked a question about the conspiracy charge or the verdict form.

When the verdicts were returned, the trial court examined the documents and found the jury had acquitted Mendez of the murder charges but had convicted him of the accessory charges and the conspiracy charge. The trial court then took a break to research the issue before recording the verdicts. A discussion eventually was held on the record where the prosecutor urged the trial court to allow the verdict to stand, even if it was an inconsistent verdict. He also argued the verdicts were not necessarily inconsistent based on a hypothetical situation that finds no support in the record.

Defense counsel pointed out the verdict form stated the jury found Mendez guilty of conspiracy to commit a crime, not conspiracy to commit murder. He asserted that if the trial court concluded the verdict forms meant that Mendez was guilty of conspiracy to commit murder, "then we need to further argue and further instruct and send them new verdict forms." Defense counsel pointed out the jury carefully followed the verdict forms, including finding errors in the verdict forms that had to be corrected before the jury could reach a verdict. He repeatedly asked the trial court to make sure the jury intended to convict Mendez of conspiracy to

commit murder before the jury was dismissed and not assume the trial court knew what the jury intended to do.

The trial court noted the verdict form used the same language as the second amended information, which labeled count 3 as "Conspiracy to Commit A Crime." The trial court also pointed out that there was no confusion or ambiguity in the trial or argument to suggest there was any conspiracy other than conspiracy to commit a murder. The trial court concluded, therefore, there was no need to alter the verdict form.

Next, the trial court concluded the jury could have found a conspiracy to commit a murder of some unidentified third individual so that this verdict was not inconsistent. Accordingly, the jury was brought back and the verdict was recorded.

Mendez argues that because the jury verdict form was unclear, we cannot be certain of which crime he was convicted. The basis for this argument is the acquittal the jury returned on the murder charges. Logically, once the jury found Mendez not guilty of murder and attempted murder, it also should have found him not guilty of conspiring to commit murder.

Defense counsel executed a declaration stating he was told by jury members that they found Mendez guilty of conspiracy to commit a crime, as stated in the verdict from. The crime, however, was conspiracy to be an accessory after the fact, not attempted murder.

It is obvious the verdict form was unclear. "Under section 182, the jury must determine which felony the defendants conspired to commit." (People v. Cook (2001) 91 Cal.App.4th 910, 918.) The jury also must find the defendant had the specific intent to commit the elements of that offense. (People v. Morante (1999) 20 Cal.4th 403, 416.) Accordingly, the jury must know what crime the defendant was accused of conspiring to commit, as well as the elements of that crime. By labeling count 3 in the verdict form as "Conspiracy to Commit A Crime" without identifying what crime the conspirators agreed upon, the verdict form permitted the jury to focus on conspiracy to commit a crime other than the one stated in the information.

This lack of clarity is the basis for Mendez's argument that the jury found him guilty of conspiracy to be an accessory

35

after the fact, a crime with a much less severe punishment than conspiracy to commit murder. Obviously, the better practice, and one that would have avoided this issue completely, would have been simply to label count 3, both in the information and the verdict form, as conspiracy to commit murder, the crime with which Mendez was charged. The failure to do so has resulted in a verdict that arguably is ambiguous. [FN5]

> [FN5] It is unclear why the trial court concluded the verdict form was proper simply because it contained the same label as the information. If the information had simply accused Mendez of conspiracy to commit a crime, it would not have withstood a demurrer for vagueness.

Where a verdict is ambiguous it must be construed "“"in light of the issues submitted to the jury and the instructions of the court." [Citations.]' [Citations.]" (<u>People v. Jones</u> (1997) 58 Cal.App.4th 693, 710.) It also must "be read in light of the charging instrument and the plea entered by the defendant. [Citations.]" (<u>People v. Paul</u> (1998) 18 Cal.4th 698, 706.)

Application of these rules establishes the validity of the verdict. The charging instrument, which was read to the jury, charged Mendez with conspiracy to murder DeAngelo and J.S. The case was tried on the theory that Mendez conspired with three other men to murder DeAngelo and J.S. The jury instructions and closing argument of both counsel reinforced the theory that Mendez was charged with conspiring with three other men to murder DeAngelo and J.S. The consistency of the presentation of the case to the jury establishes that the verdict must be construed as finding Mendez guilty of conspiring to murder DeAngelo and J.S.

We have reviewed each of the cases cited by the parties. These cases confirm our conclusion. Two of the cases, <u>People v. Camacho</u> (2009) 171 Cal.App.4th 1269 (<u>Camacho</u>) and <u>People v. Soto</u> (1985) 166 Cal.App.3d 428 (<u>Soto</u>), demonstrate why this is the correct conclusion.

In <u>Camacho</u>, the defendant and an accomplice forced two women from their vehicle and drove off with the women's personal belongings remaining in the vehicle. The defendant was charged with two counts of carjacking and two counts of second degree robbery. One count of each crime referred to each woman, i.e., one count of carjacking and one count of robbery referred to victim one and the second count of

carjacking and the second count of robbery referred to victim two. The case was presented to the jury under this theory, and the instructions and arguments were consistent. The verdict form for victim one erroneously labeled both crimes as carjacking. The appellate court had

> "no difficulty in determining the jury intended to find defendant guilty of second degree robbery of [victim two] as charged in count 2. This case was tried from start to finish with the understanding defendant was charged with two counts of carjacking and two counts of second degree robbery. Prior to jury selection, the trial court indicated its intent 'to read the information verbatim' and there is no indication the trial court failed to do so. In his opening statement, the prosecutor informed the jury he would be seeking guilty verdicts for carjacking and robbery of both victims. The jury instruction on intent referred to 'Robbery, as charged in Counts Two and Four' and 'Carjacking as charged in Counts One and Three.' The instruction on the elements of the charged offenses indicated 'defendant is charged in Counts Two and Four' with robbery, and he was 'charged in Counts One and Three' with carjacking.

> "In argument to the jury, the prosecutor stated, 'I'm going to start with carjacking which is counts 1 and 3....' At the end of the opening argument the prosecutor requested guilty verdicts 'for two counts of carjacking, two counts of robbery and a finding the special allegation is true.' Defense counsel made it clear that defendant was charged, as to each [victim], with one count of carjacking and robbery.

> "The defense sentencing memorandum repeatedly refers to the charge in count two as robbery. The prosecution sentencing memorandum also indicates a repeated understanding that defendant was convicted of robbery in count 2. For purposes of sentencing, neither the parties nor the trial court treated the conviction in count 2 as a conviction of the crime of carjacking; instead, defendant was sentenced for robbery in count 2. [Citation.]" (<u>Camacho</u>, supra, 171 Cal.App.4th at pp. 1273–1274, fn. omitted.)

These circumstances convinced the appellate court that "there is no uncertainty in the record on appeal as to the charge in count 2. The verdict finding defendant guilty in

37

count 2 cannot be construed as an express acquittal of robbery in the face of a record unambiguously demonstrating the charge in count 2 was robbery and not carjacking." (Camacho, supra, 171 Cal.App.4th at p. 1275.)

Likewise, there is no uncertainty in this record that Mendez was charged with, and convicted of, conspiracy to murder DeAngelo and J.S. Accordingly, we reject the assertion that the conviction must be reversed because the verdict was ambiguous.

Mendez asserts that Soto supports his argument. Soto was charged with first degree murder, robbery, and conspiracy to commit robbery. Numerous enhancements also were alleged, including the special circumstance that the murder was committed during the commission of a robbery.

The jury was instructed that second degree murder was a lesser offense to the first degree murder charge. The jury found Soto not guilty of first degree murder. The verdict form, however, fixed the degree of murder to be of the second degree. This discrepancy apparently occurred because the jury was not given a verdict form that would allow it to find Soto guilty of second degree murder. Another verdict form found true the allegation that Soto was armed with a firearm during the commission of the murder, while yet another verdict form found that Soto did not use a firearm during the commission of the murder within the meaning of sections 12022.5 and 1203.06, subdivision (a)(1). (Soto, supra, 166 Cal.App.3d at p. 432.) The parties, including defense counsel, interpreted the verdict as finding Soto guilty of second degree murder. This court rejected the argument. "We conclude that because the verdict form expressly found [Soto] 'not guilty' of murder and did not expressly find him 'guilty' of second degree murder, we may not construe the verdict to find [Soto] guilty of second degree murder. To do this would be an impermissible alteration of a verdict contrary to the defendant's right to an unequivocal verdict on the question of his guilt." (Soto, supra, 166 Cal.App.3d at p. 438.)

Mendez is not in the same position as Soto. The verdict found Mendez guilty of conspiracy. His argument, as explained above, is that the verdict form was ambiguous because it failed to state that the jury found Mendez guilty of conspiracy to commit murder. This argument is much more similar to Camacho than Soto. Accordingly, we conclude that Soto does not support Mendez's argument.

38

In reality, the argument Mendez is making is that the verdict was inconsistent. As explained above, logic suggests that when the jury found Mendez not guilty of the murder counts, and instead found him guilty of being an accessory after the fact, the jury also should have found him not guilty of conspiring to murder DeAngelo and J.S. Moreover, two of the overt acts the jury found true related to events that occurred before the shooting. One would expect that if the jury found these overt acts were true, the jury also would have found Mendez guilty of the murder counts, unless the jury concluded that Mendez did not know what the shooters were going to do. Needless to say, this was Mendez's defense to the murder and conspiracy charges. Once the jury decided Mendez did not know what the shooters were going to do, one would expect the jury also would have decided there was no conspiracy.

It has been long established, however, that inconsistent verdicts must be allowed to stand. "Prior to 1927, appellate courts of this state ... held that inconsistent verdicts 'would not support a judgment of conviction.' [Citations.] In apparent response to these decisions, the Legislature amended section 954 in 1927, adding the last sentence of the section, which now provides: 'An acquittal of one or more counts shall not be deemed an acquittal of any other count.' [Citations.] ... [¶] Since 1927 our courts have followed the general rule and viewed an inconsistent acquittal as the product of confusion or an act of mercy on the part of the jury, of which an appellant is not permitted to take further advantage. [Citations.]" (People v. Pahl (1991) 226 Cal.App.3d 1651, 1656–1657 (Pahl); see also People v. Santamaria (1994) 8 Cal.4th 903, 911 ["It is ... settled that an inherently inconsistent verdict is allowed to stand; if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both."].)

As Pahl explained, "The question of the validity of inconsistent verdicts usually arises when a jury renders two verdicts on two different counts which are contradictory. [Citation.] Understandably, in such cases defendants ... take the position that the acquittal is the legally correct verdict while the conviction is not. This argument has been universally rejected because inconsistent verdicts are probably the result of compromise in the jury room or of an extension of leniency or mercy to the defendant. [Citation.] In

other words, if the conviction is supported by substantial evidence, it is valid because the defendant 'had the benefit of the jury's compassion, rather than suffering a burden because of its passion....' [Citations.]" (Pahl, supra, 226 Cal.App.3d at p. 1656.) We do not know whether the jury found Mendez not guilty of the murder counts because of compassion or a sense of leniency. We are certain, however, that the guilty verdict on the conspiracy count must stand, despite the apparent inconsistency.

Mendez, 2013 WL 4830803, at *11–16.

### 2.    Analysis

Although styled as a claim that the verdict was equivocal, Petitioner's claim is premised on the argument that the verdict is inconsistent. This argument fails. There is no federal constitutional right to a consistent verdict, provided that sufficient evidence supports the conviction. See United States v. Powell, 469 U.S. 57, 65 (1984); United States v. Suarez, 682 F.3d 1214, 1218 (9th Cir. 2012) ("[I]t is well-established that '[i]nconsistent verdicts may stand, even when a conviction is rationally incompatible with an acquittal, provided there is sufficient evidence to support a guilty verdict.'" (citation omitted)); Ferriz v. Giurbino, 543 F.3d 990, 992 (9th Cir. 2005) ("The Supreme Court has made it clear that inconsistent verdicts may stand when one of those verdicts is a conviction and the other an acquittal.") Thus, the state court's rejection of the claim on this basis was not contrary to or an unreasonable application of Supreme Court precedent. 28 U.S.C. § 2254(d)(1). Petitioner is not entitled to relief on this ground.

To the extent Petitioner's argument can be read to claim that the verdict is ambiguous (see ECF No. 24 at 27), the Court notes that "federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221, (1982) (citations omitted). Thus, this Court can grant relief only if the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). On

1  this issue, the Court finds no Supreme Court authority holding that an ambiguity in the
2  verdict violates a defendant's right to due process.

3  Nonetheless, some courts have held that "a mistake or ambiguity in a verdict form
4  . . . should be considered in its context and with consideration of all of the circumstances
5  at trial," Silva v. McDonald, 891 F. Supp. 2d 1116, 1125 (C.D. Cal. 2012) (citing Skains
6  v. California, 386 Fed. Appx. 620, 622-23 (9th Cir. July 6, 2010)); Hoyle v. Ada County,
7  501 F.3d 1053, 1064 (9th Cir. 2007)), and should be analyzed under the harmless error
8  standard, which asks whether the mistake or ambiguity had a substantial and injurious
9  effect or influence on the jury's verdict, id. (citations omitted); see also Fry v. Pliler, 551
10  U.S. 112, 117-22 (2007) (Brecht harmless error standard applies in § 2254 proceedings);
11  Medina v. Woodford, No. C–06–2480 EMC, 2012 WL 177567, at *20 (N.D. Cal. 2012)
12  (verdict form error properly analyzed for harmlessness). Cf. Solis v. Garcia, 219 F.3d
13  922, 927 (9th Cir. 2000) ("Where the jury verdict is complete, but based upon ambiguous
14  instructions, the federal court, in a habeas petition, will not disturb the verdict unless
15  there is a reasonable likelihood that the jury has applied the challenged instruction in a
16  way that violates the Constitution.") (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991)).

17  Here, there is no dispute that the jury instructions correctly instructed the jury on
18  the offense of conspiracy to commit murder. The jury unequivocally convicted Petitioner,
19  by way of the verdict form, of conspiracy to commit a crime. The omission from the
20  verdict form of the specific crime – here, murder – does not render the verdict invalid. As
21  noted by the Court of Appeal, the jury in this case was presented with only one
22  conspiracy theory, and that was conspiracy to commit murder. At the start of the case,
23  the jurors were read the information, which charged Petitioner with conspiracy to commit
24  murder. The closing arguments of both the prosecution and defense identified the
25  conspiracy at issue as conspiracy to commit murder. The jurors were instructed on
26  conspiracy to commit murder. No argument was presented to suggest that any other
27  conspiracy was afoot. The jurors asked no questions regarding the conspiracy count. In

28

finding Petitioner guilty of conspiracy to commit a crime, the jurors also found true the

allegation that Petitioner "was a principal in the foregoing offense and in the commission

of the offense at least one other principal personally used a firearm, and proximately

caused great bodily injury and death to a person (other than an accomplice)[.]" (CT 3 at

706.) This finding strongly suggests that the jury, in fact, found Petitioner guilty of

conspiracy to commit murder, and that any ambiguity or inconsistency in the verdict was

the result of the jury having afforded Petitioner leniency on the murder count.

In light of the consistency in the presentation of the case, the Court cannot

conclude that the state court was unreasonable in rejecting arguments based on

ambiguity or equivocation in the verdict form. Petitioner is not entitled to relief on this

claim.

**C.      Claim Three: Denial of Release of Juror Identifying Information**

Petitioner claims his rights were violated when the trial court declined to release

juror identifying information.

**1.      State Court Decision**

The Fifth District Court of Appeal rejected this claim as follows:

> In the preceding section, we did not address Mendez's claim
> that a juror or some jurors told defense counsel after the trial
> that they found Mendez guilty of conspiracy to be an
> accessory after the fact and not conspiracy to commit
> murder. According to defense counsel's declaration, these
> jurors also stated that if the verdict form had labeled count 3
> as conspiracy to commit murder, the jury would have found
> Mendez not guilty.
>
> In his response to the prosecution's opposition to a motion to
> strike enhancements, defense counsel included a declaration
> executed by Juror No. 6 that stated, "After lengthy
> deliberation, myself, as well as other jurors, were convinced
> that because we had found Juan Mendez guilty of accessory
> after the fact, a felony, then he must necessarily be guilty of
> conspiracy to commit a felony. [¶] In other words, we, the
> jurors and myself included agreed and found that the felony
> which Juan Mendez conspired to commit was the felony of
> accessory after the fact because we agreed that Juan

Mendez joined the conspiracy after the murder was completed when he agreed to drive the others away from the crime scene and hide guns. We further agreed that ... it was not proved beyond a reasonable doubt that Juan Mendez committed conspiracy to commit murder. [¶] If the verdict form for count 3 had read 'conspiracy to commit Murder,'" the jury would have found Juan Mendez to be 'Not Guilty.'" Defense counsel executed a second declaration describing a phone conversation he had had with Juror No. 9. During that conversation, Juror No. 9 purportedly concurred with the statements made in the declaration made by Juror No. 6, but he or she refused to sign a declaration to that effect.

However, the petition for release of juror identifying information filed by Mendez pursuant to Code of Civil Procedure section 237 was supported only by defense counsel's declaration, which stated that in discussions with jurors at the conclusion of the trial, some jurors told defense counsel they found the jury instructions on count 3 to be in conflict with the verdict form. The jury instructions required the jury to decide if Mendez conspired to commit murder, while the verdict form required only that Mendez conspire to commit a crime. Some jurors also stated the verdict form implied that if they found Mendez committed the over [sic] acts, which were not directly tied to any crime, they must find him guilty of conspiracy. According to the jurors, they found Mendez guilty of conspiracy to commit the crime of being an accessory after the fact.

The prosecution opposed the motion and the trial court denied the petition. Mendez contends the trial court erred when it denied his motion.

Code of Civil Procedure section 237, subdivision (a)(2) required the trial court to seal the juror's identifying information. Subdivision (b) of this section permits any person to petition the trial court for access to the sealed records. The petition "shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal indentifying [sic] information." (Ibid.) Defense counsel's petition was based on his theory that his summary of the juror's comments could be used to support a motion for a new trial.

The relevant test for determining whether juror identifying information should be released is found in <u>People v. Rhodes</u> (1989) 212 Cal.App.3d 541 (<u>Rhodes</u>). "The Rhodes court 'applied an express balancing test to conclude the trial court,

43

in denying a defendant's request for disclosure of juror identifying information, did not abuse its inherent authority.' [Citation.] In <u>Rhodes</u>, the defendant, following his conviction of voluntary manslaughter, filed a motion for a new trial on the grounds of jury misconduct. [Citation.] '[T]he <u>Rhodes</u> court discerned several policy-based reasons to deny the defendant's request for disclosure of juror identifying information. These reasons included protecting a juror's state constitutional right to privacy; the possible deterrence of prospective jurors from fulfilling their obligation to serve if they knew they would be subject to postverdict intrusions into their lives; reducing incentives for jury tampering; promoting free and open discussion among jurors in deliberations; and protecting the finality of verdicts.' [Citation.] The <u>Rhodes</u> court held that there was 'an appropriate middle ground which can harmonize and satisfy [these] competing societal interests' by recognizing a rule that, 'upon timely motion, counsel for a convicted defendant is entitled to the list of jurors who served in the case, including addresses and telephone numbers, if the defendant sets forth a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial.... [¶] Absent a satisfactory, preliminary showing of possible juror misconduct, the strong public interests in the integrity of our jury system and a juror's right to privacy outweigh the countervailing public interest served by disclosure of the juror information....' [Citation.]" (<u>People v. Carrasco</u> (2008) 163 Cal.App.4th 978, 990.)

The first issue, as we see it, is whether the juror's comments would be admissible to support a motion for new trial based on juror misconduct. We begin with Evidence Code section 1150, subdivision (a), the relevant portion of which states:

"Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

"Pursuant to Evidence Code section 1150, subdivision (a), evidence of matters that may have influenced a verdict

44

improperly is inadmissible 'to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.' 'This statute distinguishes "between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved.... The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration."' [Citations.]" (<u>People v. Smith</u> (2007) 40 Cal.4th 483, 523, fn. omitted.)

The statements related by defense counsel were primarily related to the subjective reasoning process of the jury and thus were inadmissible. Defense counsel's declaration, and the declaration of Juror No. 6, stated that the jury *concluded* there was a conflict between the jury instructions and the verdict form. The jury *reasoned* that the verdict form prevailed over the jury instructions. The jury then *decided* that the verdict form prevailed over the jury instructions. The jury *reasoned* that because they concluded Mendez committed the charged overt acts, Mendez must have conspired to commit a crime. The jury *reasoned* that conspiracy was merely a plan but was confused by the failure of the verdict form to connect the overt acts to a specific crime. The jury *decided* Mendez conspired to commit the felony of being an accessory after the fact.

We used the italicized verbs not only because they accurately convey the statements made by defense counsel and Juror No. 6, but because these words conclusively establish that the proffered evidence exclusively related to the jury's thought process. Accordingly, the statements were not admissible, did not provide any grounds for a new trial motion, and did not provide good cause for releasing juror identifying information.

Mendez largely ignores the inadmissibility of these statements, only suggesting he would not know what information would be obtained from the jurors until he had a chance to speak with them. It is improper, however, to release juror identifying information to permit the defendant to conduct a fishing expedition. (<u>People v. Granish</u> (1996) 41 Cal.App.4th 1117, 1126–1127, citing <u>Rhodes</u>, supra, 212 Cal.App.3d at p. 552.)

45

1
2
3
4
5
6

> Moreover, Mendez has failed to explain how the information could be used to support a motion for a new trial. He asserts in his brief that section 1181, which provides the grounds for a new trial motion in a criminal trial, includes several grounds that do not involve jury misconduct, such as where a verdict has been decided "by lot, or by any means other than a fair expression of opinion on the part of all the jurors" or where the verdict is contrary to law or evidence. (§ 1181, subds.(4), (6).) Mendez fails to explain how the proffered evidence would support either ground for a mistrial.

7
8
9
10
11
12

> Finally, Mendez asserts that because, in his words, allowing the verdict to stand will result in a miscarriage of justice, and a verdict that does not accurately reflect the agreement of the jury is a miscarriage of justice, he could have moved for a mistrial on nonstatutory grounds. (People v. Whittington (1977) 74 Cal.App.3d 806, 821, fn. 7.) Since, as explained above, the information Mendez sought to prove a miscarriage of justice would not have been admissible, this argument also fails.

13
14

> Because Mendez failed to establish good cause for releasing juror identifying information, the trial court did not abuse its discretion when it denied his petition.

15  Mendez, 2013 WL 4830803, at *16–19.

16  **2.  Analysis**

17  To the extent Petitioner contends the trial court erred in applying California law

18  regarding the release of juror information, his claim is not cognizable on federal habeas

19  review. See 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. at 67–68 (federal court

20  habeas review is limited to deciding whether a state court decision violates the

21  Constitution, laws or treaties of the United States). Federal habeas relief is not available

22  to retry a state law issue that does not rise to the level of a federal constitutional

23  violation. Wilson v. Corcoran, 562 U.S. 1, 5 (2010). Instead, this Court is bound by the

24  California Supreme Court's interpretation of California law unless it is determined that

25  the interpretation is untenable or a veiled attempt to avoid review of federal questions.

26  Murtishaw v. Woodford, 255 F.3d 926, 964 (9th Cir. 2001). This Court must therefore

27
28

defer to the state court's findings that Petitioner failed to show good cause for the release of juror information under California law

Additionally, federal law imposes a broad no-impeachment rule, generally prohibiting a jury from being questioned about the deliberative process or events that occurred during deliberations. Pena-Rodriguez v. Colorado, 137 S. Ct. 855, 863-65 (2017); Hyde v. United States, 225 U.S. 347, 384 (1912). The Supreme Court has generally refused to create exceptions to this rule, relying instead on other safeguards within the jury process to protect a defendant's right to a fair and impartial jury. See, e.g., Tanner v. United States, 483 U.S. 107, 127 (1987); Warger v. Shauers, 135 S. Ct. 521, 529 (2014). The Court has cautioned that an exception to this rule may be permitted only in "extreme cases," where impeachment through jury testimony is required to protect the jury trial right, such as cases where a juror has stated he or she is acting out of racial bias. Pena-Rodriguez, 137 S. Ct. at 866–69. Thus, courts have regularly rejected claims based on a state court's refusal to permit impeachment of the jury's verdict through juror testimony. Grotemeyer v. Hickman, 393 F.3d 871, 881 (9th Cir. 2004) (no constitutional violation where the state court denied further factual development of jury misconduct allegations); Tracey v. Palmateer, 341 F.3d 1037, 1045 (9th Cir. 2003) ("Clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias [or misconduct] is raised.").

Here, there is no suggestion of juror misconduct or bias. The record does not indicate that the jury reached a verdict based on anything but the evidence and the law in this case. Petitioner does not identify, and the Court does not find, clearly established Supreme Court authority supporting the proposition that due process or the right to a fair trial required the trial court to provide defendant with juror identifying information. Furthermore, even if juror information had been provided, there is no clearly established federal law requiring evidence obtained through juror testimony to be permitted to

1    impeach the verdict. Thus, there is nothing to indicate that the trial court's failure to allow

2    Petitioner access to juror identifying information was prejudicial.

3            Accordingly, Petitioner is not entitled to relief on this claim.

4

5        **D.    Claim Four: Ineffective Assistance of Counsel**

6            Petitioner claims that defense counsel should have requested jury instructions on

7    the crime of conspiracy to be an accessory after the fact and that the failure to do so led

8    to him instead being convicted of conspiracy to commit murder.

9        **1.    State Court Decision**

10           In denying Petitioner's claim, the Fifth District Court of Appeal explained:

11               Exercising perfect hindsight, Mendez asserts defense
12               counsel should have requested jury instructions on the crime
                 of conspiracy to be an accessory after the fact as a lesser
13               offense to count 3's conspiracy to commit murder. Mendez
                 claims the failure to do so rendered trial counsel ineffective
14               and requires reversal of the judgment.

15               A defendant is entitled to a new trial if he received ineffective
16               assistance of counsel at trial. (<u>People v. Lagunas</u> (1994) 8
                 Cal.4th 1030, 1036.) "Establishing a claim of ineffective
17               assistance of counsel requires the defendant to demonstrate
                 (1) counsel's performance was deficient in that it fell below an
18               objective standard of reasonableness under prevailing
                 professional norms, and (2) counsel's deficient representation
19               prejudiced the defendant, i.e., there is a 'reasonable
                 probability' that, but for counsel's failings, defendant would
20               have obtained a more favorable result. [Citations.] A
                 'reasonable probability' is one that is enough to undermine
21               confidence in the outcome. [Citations.]

22
                 "Our review is deferential; we make every effort to avoid the
23               distorting effects of hindsight and to evaluate counsel's
                 conduct from counsel's perspective at the time. [Citation.] A
24               court must indulge a strong presumption that counsel's acts
                 were within the wide range of reasonable professional
25               assistance. [Citation.] . . . Nevertheless, deference is not
                 abdication; it cannot shield counsel's performance from
26               meaningful scrutiny or automatically validate challenged acts
                 and omissions. [Citation.]" (<u>People v. Dennis</u> (1998) 17
27               Cal.4th 468, 540–541 (<u>Dennis</u>).)

28
                                        48

"If the record contains an explanation for the challenged aspect of counsel's representation, the reviewing court must determine 'whether the explanation demonstrates that counsel was reasonably competent and acting as a conscientious, diligent advocate.' [Citation.] On the other hand, if the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation....' [Citation.]" (People v. Cudjo (1993) 6 Cal.4th 585, 623.)

Mendez's argument seeks to attack the "ambiguous verdict" from a different angle. Relying on events that occurred during deliberations, Mendez is convinced that had the jury been given an option to convict him of conspiracy to be an accessory after the fact, he would not have been convicted of conspiracy to commit murder.

We reject Mendez's argument because he cannot meet either prong of an ineffective assistance of counsel claim.

First, we conclude that defense counsel's failure to request such an instruction falls within the "wide range of reasonable professional assistance." (Dennis, supra, 17 Cal.4th at p. 541.) We emphasize that we must avoid the "distorting effects of hindsight" and evaluate the conduct based on counsel's perspective at the time. (Ibid.)

The prosecutor's theory was that Mendez was an active participant in the decision to murder rival gang members. Mendez's theory was that he merely agreed to give some friends a ride without knowing, until after the shooting, that his friends planned to shoot someone. The jury instructions and the arguments of counsel all presented the issues to the jury emphasizing these theories.

Under these theories, any reasonable attorney would expect that if the jury found Mendez not guilty of murder and attempted murder, but instead guilty of being only an accessory after the fact, then it also would have found him not guilty of conspiring to commit murder. Indeed, it was not until it became clear through jury questions that the jury was struggling with the murder counts that anyone recognized the possibility of this unusual conclusion to the trial.

Mendez has not cited, and we could not locate, any authority for the proposition that defense counsel, or any attorney for

that matter, is required to anticipate all possible issues, no matter how unlikely. Indeed, a criminal defendant is not entitled to a perfect trial, but merely a fair trial. (<u>See, e.g.</u>, <u>People v. Cunningham</u> (2001) 25 Cal.4th 926, 1009, and the cases cited therein.) While in a perfect world trial counsel might have anticipated the jury's verdict, we conclude that when we apply an objective standard of reasonableness under prevailing professional norms, it is clear that defense counsel was not ineffective for failing to do so.

Second, review of admissible evidence in the record leads to the inescapable conclusion that Mendez cannot establish he was prejudiced by the failure of counsel to request a conspiracy-to-be-an-accessory-after-the-fact instruction. As explained above, the trial was presented to the jury on the theory that Mendez was an active participant in the conspiracy to murder DeAngelo and J.S. The information charged Mendez with conspiracy to commit murder. The prosecutor's opening statement and closing statements urged the jury to find Mendez guilty of conspiracy to murder DeAngelo and J.S. The jury instructions informed the jury that Mendez was charged with conspiracy to murder DeAngelo and J.S. and then explained the elements that the jury must find beyond a reasonable doubt to reach a guilty verdict.

The jury also questioned the trial court about the verdict form during deliberations and received appropriate clarifying instructions from the trial court. This demonstrates the jury carefully considered the verdict form and the instructions. At no time, however, did the jury ever express any doubt to the trial court about the conspiracy count.

Each of these facts establishes the jury conscientiously followed the jury instructions and reached the verdict it thought appropriate after hearing all of the evidence and the argument of counsel. We conclude these facts lead to the inescapable conclusion that it is not reasonably probable Mendez would have obtained a better result if the jury had received an instruction on conspiracy to be an accessory after the fact.

<u>Mendez</u>, 2013 WL 4830803, at *19–21.

### 2.    Legal Standard

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).

Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the Court must consider two factors. Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687; see also, Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different." Strickland, 466 U.S. at 694. Petitioner must show that counsel's errors were "so serious as to deprive defendant of a fair trial, a trial whose result is reliable." Id. at 687. The Court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1348; United States v. Palomba, 31 F.3d 1456, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. at 697. Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail. However, there are certain instances which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of counsel or where the State has

interfered with counsel's assistance. Id. at 692; United States v. Cronic, 466 U.S., at 659, and n. 25 (1984).

As the Supreme Court reaffirmed in Harrington v. Richter, meeting the standard for ineffective assistance of counsel in federal habeas is extremely difficult:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." Williams, supra, at 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. 111, 129 S. Ct. 1411, 1419, 173 L. Ed. 2d 251, 261 (2009) (internal quotation marks omitted).

Harrington v. Richter, 131 S. Ct. at 785-86.

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 786. "As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." Id. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error

well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

Accordingly, even if Petitioner presents a strong case of ineffective assistance of counsel, this Court may only grant relief if no fairminded jurist could agree on the correctness of the state court decision.

### 3. Analysis

The Court of Appeal was not unreasonable in determining that Petitioner had failed to show that counsel's performance was deficient or lacking in reasonable professional judgment considering all of the circumstances. The defense theory of the case was that Petitioner did not know that his passengers intended to commit a shooting until after the shooting had occurred. A reasonable attorney could expect that, if the jury accepted this theory and found Petitioner not guilty of murder and attempted murder, they also would find him not guilty of conspiracy to commit murder. Certainly, one could envision strategic reasons to omit an instruction on conspiracy to be an accessory after the fact that would have provided the jury with an additional ground for finding Petitioner guilty of conspiracy, given this theory of the case. Instead, Petitioner's argument makes sense only with the benefit of hindsight, and in light of an arguably inconsistent verdict. It was not until the jury began to raise questions regarding its ability to reach the accessory alternative that a potential for an inconsistent verdict was recognized. (RT 17 at 3753.) Even still, the inconsistency itself did not mandate that counsel request an instruction on conspiracy to be an accessory after the fact.

Furthermore, such instruction may not necessarily have resolved the inconsistency. For this reason, the Court of Appeal was not unreasonable in determining that counsel's purported failing did not render the entire trial fundamentally unfair or unreliable. As explained above, the case was presented on a consistent theory of conspiracy to commit murder. The information, which was read to the jury, charged Petitioner with conspiracy to commit murder. The closing arguments identified the

conspiracy at issue as conspiracy to commit murder. The jurors were instructed on conspiracy to commit murder. No argument was presented as to any other conspiracy. The jurors asked no questions and expressed no confusion regarding the conspiracy count. They found Petitioner was a principal in the commission of an offense in which another principal used a firearm and proximately caused great bodily injury and death to another person. The Court cannot say that no fairminded jurist could agree on the correctness of the Court of Appeal's determination that Petitioner was not prejudiced by the lack of instruction on conspiracy to be an accessory after the fact.

### E.    Claim Five: Failure to Clarify Verdict

Petitioner contends that the trial court erred in failing to further instruct the jury or clarify the verdict forms. He contends that the jury was confused regarding the legal principles it was being asked to apply, and should have been given the opportunity to expressly find Petitioner guilty of conspiracy to be an accessory after the fact, separate from any verdict on conspiracy to commit murder.

### 1.    State Court Analysis

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

> In this argument Mendez attacks the verdict by asserting the trial court erred when it failed to clarify the verdict form before discharging the jury. Resolution of this argument again requires a detailed recitation of the events that occurred during deliberations.
>
> After deliberations began, the jury requested and received a copy of the jury instructions. The jurors also listened to Mendez's police interview at their request and received the evidence of the phone calls that were introduced into evidence. The jury also asked that the poster board that was used by the prosecution in opening argument that apparently listed the charges be sent into the jury room. This request was denied because the presentation did not include the accessory-after-the-fact charges. Instead, the trial court instructed the jury to "Consult jury instructions and/or verdict forms."

The fourth communication from the jury posed a question to the trial court about the accessory-after-the-fact charge. The jury asked, "Does the alternate theory 446 accessory after the fact ... stand alone without Count One, first degree/second degree? Judge can you come in to clarify?" After lengthy discussions between the trial court and counsel about the appropriate response, the trial court instructed the jury to reread the specific instruction dealing with the accessory counts, and also informed the jury that if the instruction did not resolve the confusion, it should send out another written question.

The first response did not resolve the jury's confusion. The following day the jury sent the following question to the trial court: "After thoroughly reading the instructions regarding first degree, second degree, and the alternative theory, our question/confusion stands on page 35. In our understanding, No. 3 and No. 5 contradict one another. If a jury were to find not guilty on first degree and not guilty on second degree, is the alternative theory completely out the window? Is it still an option?"

The reference to Nos. 3 and 5 in the question referred to the verdict forms. After a lengthy discussion, the trial court decided to respond to the question with a simple "No" to the first question (is the alternative theory completely out the window) and "Yes" to the second question (is it still an option). The trial court did note for the first time that there was a potential inconsistent verdict if the jury found Mendez not guilty of murder, guilty of being an accessory after the fact, and guilty of conspiracy to commit murder.

The jury asked another question the following day: "Does the law state that the driver of the vehicle involved in a crime is as guilty as the shooter?" The trial court referred the jury to the aiding and abetting instructions. Approximately four hours later, the jury informed the trial court that it had reached a verdict.

When the jury was brought back into the courtroom, the trial court confirmed with the foreperson that a verdict had been reached and then examined the verdict form completed by the jury. The trial court then ordered the jury back to the deliberation room because of a possible "inconsistent verdict." The trial court then went into chambers to do research on the issue and eventually invited both counsel into chambers to discuss the issue. When the trial court and the attorneys returned to the courtroom, each party was

55

permitted to summarize its arguments for the record. The prosecution essentially argued that case law permits inconsistent verdicts and the existence of an inconsistent verdict did not establish jury confusion.

Defense counsel pointed out that the verdict form stated Mendez was guilty of conspiracy to commit a crime, not conspiracy to commit murder, and therefore further argument and instruction was required, along with further deliberations and a different verdict form. Defense counsel concluded that "unless this Court is prepared to sentence Mr. Mendez to the punishment for conspiracy to commit a murder—and the Court knows what the sentence is—that the Court should not simply interlineate the word 'murder' in that verdict form. We should find out from this jury if that's—if that's their intention to convict this man of that crime."

The trial court concluded that because the verdict form was consistent with the information, and the entire case had been tried on the theory that Mendez was accused of conspiracy to commit murder, there was "no need to alter that [verdict] form and send it in or ask for re-argument or anything else." The trial court also opined that the jury may have concluded Mendez conspired to murder a different individual other than the actual victims, and therefore the verdict was not inconsistent. The verdict was then recorded after the jury returned to the courtroom.

Mendez cites section 1138 as authority for his argument that the trial court erred when it failed to obtain clarification from the jury about the verdict on the conspiracy charge. This section states:

"After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

This section has been interpreted to require the trial court to resolve any instructional confusion expressed by the jury, which is consistent with the trial court's duty to help the jury understand the legal principles in the case. (People v. Giardino (2000) 82 Cal.App.4th 454, 465.) Thus, "When a jury makes explicit its difficulties [understanding the jury

instructions,] a trial judge should clear them away with concrete accuracy." (<u>Bollenbach v. United States</u> (1946) 326 U.S. 607, 613–614.)

While these principles are well established, they do not aid Mendez because the jury never expressed any confusion about the conspiracy charge. Mendez focuses on the issues the jury had with the murder counts and the accessory-after-the-fact counts to theorize that "the jury was confused regarding the legal principles it was being asked to apply." Mendez goes on to theorize the jury may have concluded he was guilty of conspiring to be an accessory after the fact.

While we agree the issue could have been, and perhaps should have been, resolved by obtaining a clarification from the jury about the target crime of the conspiracy count, the failure to do so did not implicate section 1138 or the trial court's duties because the jury never expressed any confusion about the jury instructions relating to the conspiracy count. The trial court responded to each of the questions posed by the jury in an appropriate manner and thus did not violate the requirements of section 1138, or any other authority of which we are aware.

<u>Mendez</u>, 2013 WL 4830803, at *21–22.

## 2. Analysis

As stated above, there is no federal constitutional right to a consistent verdict, provided that sufficient evidence supports the conviction. <u>See</u> <u>United States v. Powell</u>, 469 U.S. 57, 65 (1984); <u>United States v. Suarez</u>, 682 F.3d 1214, 1218 (9th Cir. 2012) ("[I]t is well-established that '[i]nconsistent verdicts may stand, even when a conviction is rationally incompatible with an acquittal, provided there is sufficient evidence to support a guilty verdict.'" (citation omitted)); <u>Ferriz v. Giurbino</u>, 543 F.3d 990, 992 (9th Cir. 2005) ("The Supreme Court has made it clear that inconsistent verdicts may stand when one of those verdicts is a conviction and the other an acquittal.") Thus, there is no clearly established Supreme Court precedent requiring the court to clarify a potentially inconsistent verdict. The state court's rejection of this claim was not contrary to or an unreasonable application of Supreme Court precedent. 28 U.S.C. § 2254(d)(1). Petitioner is not entitled to relief on this ground.

**F.    Claim Six: Challenge to Firearm Enhancement**

As stated above, Petitioner contends that his conviction on Count 3 should be construed as a conviction for conspiracy to be an accessory after the fact, rather than conspiracy to commit murder. As such, he argues that the firearm enhancement is inapplicable and should be stricken.

**1.    State Court Decision**

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

> Mendez contends that even if we were to affirm the conviction for conspiracy to commit murder, he still is entitled to the benefit of the doubt as to this ambiguous verdict, and therefore the verdict must be interpreted to find him guilty of a conspiracy to be an accessory after the fact. If the conviction is for conspiracy to be an accessory after the fact, Mendez asserts the firearm enhancement is inapplicable and must be stricken.
>
> As explained above, review of the admissible evidence in the record compels the conclusion that the verdict was not ambiguous. The jury found Mendez guilty of the crime of conspiracy to commit murder. Thus, the premise of this argument fails and the argument must be rejected.

Mendez, 2013 WL 4830803, at *19.

**2.    Analysis**

Because the undersigned concludes, as explained above, that the state court was not unreasonable in construing Count 3 as a conviction for conspiracy to commit murder, there is no basis to reach the merits of this claim.

**VI.    Recommended Relief**

The Court has concluded that Petitioner is entitled to relief on the first claim raised in his petition.

Federal district courts have broad discretion in conditioning a judgment granting habeas relief. Hilton v. Braunskill, 481 U.S. 770, 775, (1987). Pursuant to 28 U.S.C. § 2243, federal courts are authorized to dispose of habeas corpus matters "as law and justice require." "In modern practice, courts employ a conditional order of release in

58

appropriate circumstances, which orders the State to release the petitioner unless the State takes some remedial action, such as to retry (or resentence) the petitioner." Harvest v. Castro, 531 F.3d 737, 741-742 (9th Cir. 2008) (citing Wilkinson v. Dotson, 544 U.S. 74, 89 (2005)); Herrera v. Collins, 506 U.S. 390, 403 (1993); Hilton v. Braunskill, 481 U.S. 770, 775 (1987) ("[T]his Court has repeatedly stated that federal courts may delay the release of a successful habeas petitioner in order to provide the State an opportunity to correct the constitutional violation found by the court.")); see also Nettles v. Grounds, 830 F.3d 922, 930 (9th Cir. 2016). "[C]onditional orders are essentially accommodations accorded to the state, in that conditional writs enable habeas courts to give States time to replace an invalid judgment with a valid one. The consequence when the State fails to replace an invalid judgment with a valid one is always release." Harvest v. Castro, 531 F.3d at 742 (quotations omitted).

Accordingly the Court recommends that Petitioner be ordered released within ninety (90) days of the adoption of the instant findings and recommendation by the District Court Judge unless Respondent notifies the Court of the state's intent to retry Petitioner.

**VII.    Conclusion and Recommendation**

Based on the foregoing, the Court finds that Petitioner is entitled to relief on Claim One of the petition for writ of habeas corpus. Accordingly, it is HEREBY RECOMMENDED that the petition be granted and that Petitioner be granted conditional release.

The findings and recommendation are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within **thirty** (30) days after being served with the findings and recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after

service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   April 4, 2018                   /s/ *Michael J. Seng*
                                         UNITED STATES MAGISTRATE JUDGE